IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARY TALLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:15-cv-00582 |
| v. ) | |
| ) | Judge Trauger |
| NANCY BERRYHILL,[1] ) | Magistrate Judge Newbern |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is Plaintiff Mary Talley's Motion for Judgment on the Administrative Record ("Motion") (Docket No. 15), filed with a Memorandum in Support (Docket No. 16). Defendant Commissioner of Social Security ("Commissioner") filed a Response in Opposition to Plaintiff's Motion (Docket No. 17), to which Plaintiff replied (Docket No. 18). On May 26, 2015, this case was referred to a Magistrate Judge. (Docket No. 3.) The court hereby withdraws that referral. Upon consideration of the parties' filings and the transcript of the administrative record (Docket No. 11),[2] and for the reasons given below, the Plaintiff's Motion (Docket No. 15) will be denied.

### I. Introduction

Talley filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and an application for supplemental security income ("SSI") under Title XVI on November 18, 2011, both alleging a disability onset of November 14, 2010. (Tr. 11.)

---

[1] Nancy Berryhill became Acting Commissioner for the Social Security Administration on January 23, 2017.
[2] Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

Talley's claim was denied at the initial and reconsideration stages of state agency review. Talley subsequently requested *de novo* review of her case by an Administrative Law Judge ("ALJ"). The ALJ heard the case on September 11, 2013, when Talley appeared through counsel and gave testimony. (Tr. 35–49.) Testimony was also received from a vocational expert. (Tr. 39–57.) At the conclusion of the hearing, the matter was taken under advisement until October 29, 2013, when the ALJ issued a written decision finding Talley not disabled. (Tr. 8–30.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2. The claimant has not engaged in substantial gainful activity since November 14, 2010, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: major depressive disorder, obesity and osteoarthritis of the left knee (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, … the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) in that she can occasionally lift/carry 20 pounds and frequently lift/carry ten pounds. She can stand/walk for six hours in an eight-hour workday and sit for six hours. However, she can only occasionally climb ladders, ropes and scaffolds and can only frequently climb stairs/ramps, balance, crawl, kneel, stoop, crouch, or handle with her right upper extremity. She can understand, remember and carry out simple, detailed and multistep detailed, but not executive level tasks. She can maintain concentration, persistence and pace for those tasks, can interact appropriately with others, but can adapt to only occasional changes in the workplace.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on December 13, 1962 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 14, 2010, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 13–16, 23–25.)

On March 27, 2015, the Appeals Council denied Talley's request for review of the ALJ's decision (Tr. 1–5), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g).

## II.   Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

> The claimant also had right epicondylitis and surgical repair before the alleged onset date. By January of 2011, she was requesting, and was released by her orthopedist, to return to regular duty work. In October, she saw Dr. Brian Koch for follow up after her surgery and demonstrated full range of motion of her shoulder, elbow and wrist. He described her tenderness as minimal and noted five out of five strength distally. She was to return to regular duty work. There is no loss of strength or sensation in her affected extremity documented in the record. She also did not follow up with her surgeon. She complained of shoulder pain when she visited her primary care provider in August of 2011, but he did not address the complaint in either his "assessment" or "plan." In the "review of the systems," he acknowledged her complaints with a "yes" for arthritis, joint pain and joint stiffness, but attached the label "no" to back pain, and joint swelling. The examination revealed normal gait, no muscle weakness, motor strength of five out of five in all four extremities, no sensory/motor deficit and no joint swelling or tenderness. It is interesting to note that when the claimant went to

Cumberland Mental Health Center in January of 2012, the only physical problem recorded was hypertension. When the claimant visited Dr. Gomez that same month, she had full range of motion in both shoulders, both wrists and both elbows.

…

Five months prior to her alleged onset date, the claimant visited the emergency room at University Medical Center with suicidal ideation in June of 2010. She reported a longstanding depression with a "meltdown" the previous day and was assigned a GAF score of 25. It is interesting to note she had been to the Sumner Regional Medical Center ER with acute back and chest pain the day before, that is the day of the reported "meltdown". She did not report any emotional or mental complaints at this visit, and in fact, her chest pain was felt to be musculoskeletal in nature (shoulder related). She was noted to be stable and report [sic] feeling much better after getting pain medication. Exhibits 1F and 2F.

The claimant was kept in the hospital for five days for psychiatric treatment. Two days after discharge, she met with social worker, Wendy Foster for follow up at Cumberland Mental Health Center. She was described this time as having sad affect and depressed mood, but appropriate appearance, behavior, insight level, judgment level and impulse level. She had normal thought content, organized thought flow, fair recent memory, remote memory and concentration. Her insight, judgment and impulse ratings were all good, and she was assigned a GAF score of 50. Exhibit 3F.

The claimant missed follow up appointments for both medication management and individual therapy. She was a "no show" for July, August and September after her discharge. She did however, report for an assessment on August 2, 2010 and reported that the prescriptions she had received at the hospital were helping with her anxiety and depression. She had been out of Xanax for about two weeks and felt more anxiety and crying since being out of it. Exhibit 3F.

Turning to the time period at issue, it is noted in the mental health records that the claimant continued with her pattern of missed appointments. The claimant missed appointments in March and April of the following year, 2011. Although she missed her appointment for medication management in April, she did present for individual therapy in late April and was open and responsive to

4

the counselor. She had lost her insurance and was experiencing more anxiety and depression without her medications. In May and June, she again missed appointments. Exhibit 3F.

The claimant visited her primary care provider in August of 2011 and reported crying spells, sadness, weight gain and irritability. However, she also admitted that she had stopped taking her antidepressants. He prescribed Wellbutrin and Alprazolam. When meeting with her case manager in December, the claimant admitted that she was staying with her daughter and was helping take care of her grandchildren. Her GAF score at that time was a 54. Exhibits 4F and 17F.

A report from January of 2012 is labeled by the psychiatrist as an "initial assessment." The notes are confusing because they include both allegation and denial of hallucinations. They also show that the claimant has been effectively treated with psychotropic medication but cannot afford to purchase the medication that works best. Even so, she was assigned a GAF score of 54, and her diagnosis of major depressive disorder was characterized as "mild." Exhibits 6F and 17F.

When the claimant saw Ms. Anderson that same month, she reported that she was staying with her daughter and helping take care of her grandchildren. She "did not report any recent physical health issues or concerns." However, this report of caring for children is not consistent with the report she gave at her intake assessment meeting. For that meeting she said she was depressed, having panic attacks weekly, feeling socially anxious, feeling closed in and shaking. She was having thoughts of suicide weekly. The claimant met with three different care providers on that day, and interestingly, told the third person, her care coordinator, that she had experienced no suicidal ideation. It may be that her condition was situational in light of the fact that her daughter had apparently just been shot in the face. Regardless, the claimant did not explain these inconsistent reports. Exhibit 17F.

In February of 2012, the claimant told her care coordinator that she was starting to feel a little better with medication, but she was almost out of meds. The coordinator encouraged her to contact the nurse. The claimant again did not report any physical issues. Three days later, she admitted that she had several situational stressors. Later that month her medication was adjusted and the claimant complained that her knee hurt, but she could not afford to see a doctor. In April, the claimant told her case manager that she

intended to work on medication management and added that her grandchildren had been taken into DCS custody. She was experiencing increased depression and talked about jumping off a bridge. She also expressed homicidal ideation towards DCS workers. She was transported to CSU for crisis intervention. The next day, the nurse practitioner described the claimant as cooperative with good eye contact and appropriate appearance. Her memory was intact and her insight and judgment were fair. She opined that the claimant had low risk for suicide and noted that her "*reported psychosis [was] incongruent to presentation.*" That same day, a second person, this time a registered nurse at the same facility, wrote that the claimant did "*not present with acute signs of distress.*" Two days later, the claimant was discharged. She reported, "I feel pretty good today." She thought the groups had been helpful, and she felt better able to cope with distress. Her mood was improving. She was described as having average intelligence, intact memory and fair insight and judgment. *Id.*

…

In January of this year, the claimant was described by her case manager as "verbally engaged during the visit." Her daughter was present during the visit "along with multiple children." In February, the claimant was "very talkative while riding in CC's car." She also admitted that she helps take care of some of her grandkids." [sic] She admitted that Wellbutrin was a good medicine for her, but she had to get off of it because she had no insurance. She was experiencing low energy and low motivation. In March, she said she had gotten better results from Cymbalta and changed her medications again. *Id.*

In June of 2013, the claimant's case manager visited her home and noted that it was clean and had no clutter. The claimant was dressed appropriately and appeared to have good hygiene. The claimant told her case manager that her medications *were helping to keep her emotionally stable. She also said she had custody of her grandchildren and enjoyed spending time with them.* Exhibit 19F.

When the claimant was seen in the emergency room at Sumner Regional Medical Center after a car accident, her psychiatric evaluation showed, "normal mood and affect." While this opinion is not based on a long visit with a specialist, it appears to be consistent with the evidence that she can care for both her home

6

and her grandchildren. She admitted to the independent consultant that she needs no help with medication or finances.

…

In March 2013, the claimant complained of pain in her leg to healthcare providers at Mental Health Cooperative. The claimant visited the emergency room in May of 2012 with knee pain of a month's duration. The staff opined that she had arthritis, but no imaging studies were made. In February of 2013, the claimant returned with complaint of leg pain. X-rays revealed no fracture or malalignment, and the ankle was grossly unremarkable. However, there was *mild* osteoarthritis in the left knee. A week later, she twisted her leg/knee at a gas station that resulted in some soft tissue swelling. *Mild* osteoarthritis of the tibiotalar joint and the naviculocunelform articulation was revealed in x-rays. Both x-ray impressions described *mild* osteoarthritis, not more severe. Exhibit 16F.

The claimant visited the ER of Sumner Regional Medical Center after a church van in which she was riding hit a telephone [pole] in July of 2013. Her gait was normal, and her extremities were "able to range without issues." She visited TriStar Medical Group for follow up when she left the hospital. Dr. Brandon Allen diagnosed urinary tract infection and knee pain. He directed the claimant to drink plenty of fluids, take over-the-counter ibuprofen and to try water aerobics for activity. The claimant then visited Rivergate Sports Medicine and Orthopaedic [sic] Surgery. She was encouraged to go to physical therapy and given anti-inflammatories. When she was seen in August, she had only had one session at physical therapy, and had reported experiencing only minimal improvement in pain. However, upon examination, her gait was much improved. … According to notes from the physician's assistant, written in July of this year, 2013, the claimant had had the problem for two to three months at that time. The last medical records show that as of September, the physician's assistant felt an MRI of the knee was necessary. Exhibits 18F, 20F, 21F, and 22F.

When the claimant saw Dr. Albert Gomez in January of 2012, she weighed 245 pounds without shoes. He noted that she had decreased range of motion in both hips secondary to her obesity. The records show her weight fluctuates on a continuing basis.

…

> When the claimant saw Dr. Albert Gomez, he recorded her history and complaints as reported to him. She explained that she had a history of tendonitis and experienced chronic pain in her right shoulder, right elbow and right wrist that was aching, severe and constant. She explained that she had right shoulder surgery in 2008 and right elbow surgery in 2009. She also complained of chronic pain in her lower back and right knee of six-month duration. This pain was also aching, severe and constant. Exhibit 5F.
>
> Dr. Gomez noticed that the claimant had a normal gait and got on and off the exam table with moderate difficulty. She had negative straight leg raises. Both of her shoulders had full range of motion, but moderate tenderness to palpation. She had full range of motion in both elbows and both wrists. The right wrist had moderate tendonitis. Her fine finger movements were normal and she was able to make a fist normally. Her pinch grip was also normal. There was some limited range of motion in her hips secondary to obesity. The claimant's right knee had marked tenderness to palpation, but no edema. The left knee was without tenderness. She had full range of motion in both ankles and good handgrip bilaterally. Her motor strength was five out of five in all four extremities. Interestingly, there was no tenderness to palpation in the lumbar spine and full range of motion. The claimant was able to tandem walk normally, but could not walk on her heels and had difficulty walking on her toes due to knee pain. … She was also unable to squat.

(Tr. 13–14, 17–21 (emphasis in original.)

### III.   Conclusions of Law

### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting

*Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The SSA considers a

claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart B of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity[.]" *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v.*

*Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Plaintiff's Statement of Errors

#### 1. *Treating Source*

Talley argues that, although Nurse Practitioner Dena Wampler is not an "acceptable medical source," she nevertheless qualifies as a treating source and that the ALJ thus erred by not properly considering Wampler's opinion. (Docket No. 16, p. 7.) Additionally, Talley contends that the ALJ's decision violates SSR 06-03p, which governs the consideration of opinions and information from non-medical sources. These arguments are meritless for several reasons.

First, Talley's repeated, conclusory contention that Nurse Wampler qualifies as a "treating source" is patently deficient. The term "treating source" is a legal term of art, defined

11

in the SSA regulations as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  "Acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. § 404.1513(a).  As a nurse practitioner, Nurse Wampler is thus not an "acceptable medical source," a fact Talley concedes in her Motion (Docket No. 16, p. 11).  Therefore, Nurse Wampler's opinion does not fall within the purview of the treating physician rule contained in 20 C.F.R. § 404.1527, which requires the ALJ to provide "good reasons" for declining to give controlling weight to a treating source's opinion.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013) (citing SSR 06-03p).

Talley's reliance on SSR 06-03p is similarly misguided.  SSR 06-03p clarifies that "[a]n ALJ must consider other-source opinions and 'generally should explain the weight given to opinions [from] these 'other sources[.]'"  *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) (alteration in original) (quoting SSR 06-03p).  In evaluating the opinions from "other sources," an ALJ should consider various factors, "including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion."  *Cruse*, 502 F.3d at 541 (citation omitted); *see* SSR 06-03p.  Still, "[s]o long as the ALJ addresses the opinion [from an 'other source'] and gives reasons for crediting or not crediting the opinion, the ALJ has complied with the regulations."  *Drain v. Comm'r of Soc. Sec.*, No. 14-cv-12036, 2015 WL 4603038, at *4 (E.D. Mich. July 30, 2015) (citing *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011)).

Talley contends that the ALJ's reasons for discounting Nurse Wampler's opinion are insufficient. She selectively quotes the ALJ's analysis of Nurse Wampler's evidence, citing only: "the claimant lives with a friend, goes to church regularly, cares for her grandchildren, and is always described by physicians and nurses in the emergency room as pleasant," and that, "[w]hen evicted, she and a friend found housing. She takes care of her grandchildren and coped with her daughter's attack and gunshot wound." (Docket No. 16, p. 10.) In fact, the ALJ's full analysis of the value of Wampler's evidence is as follows:

> Dena Wampler … provided a medical source statement. However, opinions from a nurse are not considered authoritative for purposes of determining levels of functioning. Even so, this care provider opined that the claimant had only slight limitations in her ability to understand, remember and carry out short, simple instructions, which is consistent with the conclusions of Dr. McQuain. She opined that the claimant had marked limitations in doing the same for detailed instructions. Ms. Wampler also opined that the claimant was markedly limited in her ability to interact with others and adapt to change. However, there is little evidence in the record to support that opinion. The claimant lives with a friend, goes to church regularly, cares for her grandchildren and is always described by physicians and nurses in the emergency room as pleasant. When evicted, she and a friend found housing. She takes care of her grandchildren and coped with her daughter's attack and gunshot wound. The severity of these assigned limitations appears to be overstated and is not supported by the evidence. Numerous care providers have noted the claimant to have normal mood and affect, and the independent consultant opined that she had only moderate impairment is [sic] social functioning and adapting.

(Tr. 22.) When read in full, it is clear that Talley's argument is misleading and without merit. The portion that Talley relies upon is used by the ALJ to illustrate inconsistencies in Nurse Wampler's opinion and the evidence of record. A full reading also shows that the ALJ specifically provided other examples of Nurse Wampler's inconsistency with the record and with other medical sources, which is precisely one of the factors that must be considered. *See* SSR

06-03p. As shown above, the ALJ also noted that Nurse Wampler was not an acceptable medical source, another factor for consideration under SSR 06-03p. *See id.* (requiring the ALJ to consider the "examining relationship between the individual and the 'acceptable medical source'"). Talley makes no mention of the ALJ's stated reasons and offers no explanations for the inconsistencies. Further, an opinion's consistency with other evidence is one of the SSR 06-03p factors that Talley claims the ALJ failed to apply. Such is not the case. The court finds that the ALJ adequately explained why she discredited Nurse Wampler's opinion, and the decision is therefore supported by substantial evidence.

  2. *Nontreating Sources*

In a similar vein, Talley next argues that the ALJ erred by inappropriately deferring to opinions of nontreating physicians over the opinion of Nurse Wampler, in violation of 20 C.F.R. § 404.1527. (Docket No. 16, pp. 12–14.) Again, Nurse Wampler is not an "acceptable medical source" and thus does not fall within the purview of the treating physician rule contained in 20 C.F.R. § 404.1527. As discussed above, the court finds that the ALJ's treatment of Nurse Wampler's opinion was proper; thus Talley's second argument is meritless.

  3. *RFC Assessment*

Talley's third contention is that the ALJ erred by failing to include a function-by-function assessment in the RFC determination, as required by SSR 96-8p. (Docket No. 16, pp. 14–15.) SSR 96-8p states that the ALJ should address a claimant's exertional and nonexertional capacities and also describe how the evidence supports his or her conclusions. *See Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547–48 (6th Cir. 2002) (per curiam); *see also Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 421 (6th Cir. 2014) (holding "that the ALJ complied with the applicable regulations by assessing each of [the claimant's] work-related limitations that

14

were at issue."); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013) (finding that the ALJ complied with SSR 96-8p, since he "fully specified [claimant's] exertional and nonexertional abilities."). Here, the record reflects that the ALJ complied with the applicable regulations by assessing each of Talley's work-related limitations that were at issue. Additionally, Talley asserts that "the ALJ failed to include substantial limitations in the RFC finding correlating to symptoms and limitations which were well-documented in the record." (Docket No. 15, p. 15.) However, she neglects to identify any limitations unaccounted for by the ALJ. As such, the court finds that Talley's third argument fails.

### 4. *Severe Impairments*

Talley's final argument is that the ALJ erred by failing to properly consider each of her severe impairments. (Docket No. 16, p. 15.) While the ALJ found that Talley was severely impaired by her major depressive disorder, obesity, and osteoarthritis of the left knee, Talley contends that the ALJ failed to sufficiently state why she did not find Talley's hypertension, right rotator cuff tendonitis, right lateral epicondylitis, and right de Quervain's tenosynovitis to be severe impairments. (Docket No. 16, p. 15.)

At step two of the sequential evaluation process, "the ALJ must find that the claimant has a severe impairment or impairments" to be disabled. *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88 (6th Cir. 1985); *see* 20 C.F.R. § 404.1520(a)(4)(h). "[A]n impairment is considered 'severe' unless 'the [claimant's] impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 324 (6th Cir. 2015) (quoting SSR 85-28). As such, "the claimant's burden of establishing a 'severe' impairment during the second step of the disability determination process is a '*de minimis* hurdle.'" *Id.* at 324–25 (quoting *Higgs v. Bowen*, 880

F.2d 860, 862 (6th Cir. 1988)). "Under [this] prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* at 325 (quoting *Higgs*, 880 F.2d at 862).

"[O]nce any one impairment is found to be severe, the ALJ must consider both severe and nonsevere impairments in the subsequent steps." *McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008) (citing *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)); 20 C.F.R. § 416.945(a)(2). Therefore, it is "legally irrelevant" that an impairment was determined to be nonsevere if the ALJ finds other severe impairments. *See McGlothin*, 299 F. App'x at 522 (reasoning that "because the ALJ found that [plaintiff] has some severe impairments, he proceeded to complete steps three through five of the analysis. It then became "legally irrelevant" that her other impairments were determined to be not severe") (quoting *Higgs*, 880 F.2d at 862)). As explained by the Sixth Circuit,

> [a]n ALJ's failure to find a severe impairment where one exists may not constitute reversible error where the ALJ determines that a claimant has at least one other severe impairment and continues with the remaining steps of the disability evaluation. This rule is predicated on the notion that the ALJ 'properly could consider claimant's [non-severe impairments] in determining whether claimant retained sufficient residual functional capacity to allow [him] to perform substantial gainful activity.'

*Winn*, 615 F. App'x at 326 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *see also Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (holding that an ALJ's failure to find an impairment severe at step two is not reversible error if the ALJ "considers all of a claimant's impairments in the remaining steps of the disability determination."); 20 C.F.R. § 404.1523 (stating that, when making a disability determination, the Regulations require that if one severe impairment exists, the Commissioner "will consider the

16

combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

In the present case, the ALJ found that Talley had severe major depressive disorder, obesity, and osteoarthritis of the left knee. Talley claims her hypertension, right rotator cuff tendonitis, right lateral epicondylitis, and right de Quervain's tenosynovitis should also have been found to be severe. Even assuming Talley is correct, the court finds that any error in this regard was harmless. The ALJ found three conditions constituted severe impairments and then continued on with the disability analysis. (*See* Tr. 13.) Thus, Talley succeeded at step two. Further, the ALJ considered both her severe and nonsevere impairments when determining her RFC. (Tr. 20–21.) Therefore, Talley's fourth claim of reversible error fails, since it is "legally irrelevant" that the ALJ classified her hypertension, right rotator cuff tendonitis, right lateral epicondylitis, and right de Quervain's tenosynovitis as nonsevere.

## IV. Conclusion

For the reasons stated herein, Plaintiff's Motion for Judgment on the Record (Docket No. 15) will be denied and an appropriate Order entered.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE